# Office of Disciplinary Counsel v. Evans

Disciplinary Board Docket no. 152 D.B. 2000.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

SHEERER, *Member,* December 16, 2002—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On July 19, 2001, petitioner, Office of Disciplinary Counsel filed a petition for discipline against Daniel J. Evans, respondent in these proceedings. The petition charged respondent with violations of the Rules of Professional Conduct and the Pennsylvania Rules of Disciplinary Enforcement arising out of his alleged misappropriation of entrusted funds. Respondent did not file an answer to the petition.

A disciplinary hearing was held on October 30, 2001, before Hearing Committee 4.05 comprised of Chair Alan R. Krier, Esquire, and Members Sheila M. Ford, Esquire, and Marion Laffey Ferry, Esquire. Respondent appeared pro se. Petitioner introduced 23 exhibits, including a stipulation to most of the facts as alleged in the petition for discipline. Respondent testified but did not offer any exhibits.

After briefing by the parties, the committee concluded that respondent violated the rules as charged in the petition for discipline and recommended that respondent be disbarred.

No briefs on exception were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting of June 12, 2002.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is located at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania 15219, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid rules.

(2) Respondent was born in 1937 and was admitted to practice law in the Commonwealth of Pennsylvania in 1966. He maintains his office at 1302 Beaver Street, P.O. Box 556, Sewickley, Pennsylvania 15143.

(3) On or about April 23, 1996, Joan K. Youngquist (decedent) died testate, while a resident of Allegheny County, owning both real and personal property.

(4) Under terms of decedent's will, respondent was named executor of her estate.

(5) In the will, Mia Dean, decedent's daughter, was bequeathed all home furnishings, clothing, jewelry, and the car.

(6) It was directed in the will that all real estate belonging to decedent was to be sold, with the proceeds to be turned over to Chaplin-Mullaugh, or "such other money manager" as respondent saw fit, for investment during the term of the administration of the estate.

(7) The will further directed that, when the estate was settled, the balance for distribution was to be divided into five shares, one share to be distributed to Mrs. Dean and the remaining four shares to be distributed to a trustee of the Youngquist-Dean Family Education Trust for the benefit of decedent's grandchildren in accordance with the terms of the trust.

(8) Mrs. Dean and her husband, John Dean, are the trustees of the trust.

(9) On or about April 26, 1996, letters testamentary were granted to respondent as executor of the estate.

(10) After his appointment as executor through about the end of October 1997, respondent sold the real estate located at 317 Hazel Lane, Sewickley, PA, and liquidated the stocks and bonds.

(11) The proceeds from the sale of the real estate were deposited by respondent to Mellon Bank account no. 143-8160 captioned "Estate of Joan K. Youngquist, Daniel J. Evans, exec.," over which respondent had sole signatory authority.

(12) On or about July 19, 1996, respondent issued Mellon Bank check no. 125, drawn on the estate account, in the amount of $21,000 as payment of the inheritance taxes for the estate.

(13) From about December 1, 1996, through about August 11, 1997, respondent made distributions from the

estate account to Mrs. Dean and the trust in the total amount of $272,469.

(14) On or about January 21, 1997, respondent filed the inventory which listed the total value of the probate estate assets in the amount of $419,215.66, and non-probate assets valued at $88,937.28.

(15) On or about January 23, 1997, respondent filed the inheritance tax return.

(16) On the return, respondent claimed fees relating to the estate totaling $21,238.21, which included his executor's fee and attorney's fee of $10,000 each, and $1,238.21 for estate planning services rendered to decedent.

(17) The total inheritance tax due on the estate was $28,247.85.

(18) Subtracting the previous payment for inheritance taxes and discount in the total amount of $22,050, a balance for inheritance taxes was owed in the amount of $6,197.85.

(19) On or about January 24, 1997, respondent issued check no. 190 drawn on the estate account in the amount of $6,197.85 as payment of the remaining balance on the inheritance taxes for the estate.

(20) By a notice dated April 14, 1997, the Pennsylvania Department of Revenue informed respondent that the inheritance tax return was accepted as filed and there was a credit due to the estate in the amount of $55.26.

(21) By early December 1997, by checks made payable to himself or to cash, respondent had taken for his own use all remaining assets of the estate, which amounted to over $90,000 over and above the fees claimed by him.

(22) In or about January 1998, Mrs. Dean telephoned respondent to inquire on the status of the estate.

(23) Respondent told Mrs. Dean that there was "little left in the estate," and he would forward a partial accounting to her.

(24) After payment of expenses listed on the inheritance tax return, including respondent's fees, there should have been over $90,000 remaining in the estate, and respondent remained entrusted with those funds.

(25) Mrs. Dean did not then receive any accounting from respondent.

(26) In or about April 1998, Mrs. Dean requested that respondent provide her with information as to the status of the estate.

(27) Respondent did not respond to Mrs. Dean.

(28) Between April 1998 and December 1998, Mr. Dean telephoned respondent on at least two occasions to inquire as to the status of the estate and left messages on his answering machine for a return call.

(29) On one occasion respondent returned Mr. Dean's call and stated that "nothing was left in the estate" and he would get to finalizing it.

(30) Respondent's assertion concerning the estate assets was false, since over $90,000 should have remained in the estate.

(31) Between December 1998 and April 1999, Mr. and Mrs. Dean had no contact with respondent, nor did they receive the partial accounting for the estate which he had previously promised to send to them.

(32) By letter to respondent dated September 7, 1999, Attorney Charles Humphreys, on behalf of Mr. and Mrs.

Dean, requested that respondent expedite the closing of the estate and prepare an accounting for review by Mrs. Dean.

(33) Respondent did not provide Mrs. Dean with an accounting of estate assets, or otherwise respond to Attorney Humphreys' letter.

(34) In a conversation with him on February 10, 2000, respondent told Attorney Michael Wiethorn, who Mr. and Mrs. Dean had retained concerning the estate, that:

(a) The only outstanding matter that needed to be addressed was the settlement of an income tax dispute with the Commonwealth of Pennsylvania;

(b) The remaining assets in the estate were in the amount of $1,000; and,

(c) As soon as the tax dispute was resolved a family agreement or first and final account would be prepared.

(35) Thereafter, neither Attorney Wiethorn nor Mr. and Mrs. Dean received any documentation from respondent in regard to finalizing the estate.

(36) The inheritance tax return had been accepted as filed by respondent, and the remaining estate assets should have exceeded $90,000.

(37) By letter to respondent dated April 24, 2000, Attorney Wiethorn forwarded to respondent a copy of a motion to compel executor to file an account, and informed respondent that he would present it to the court on May 9, 2000.

(38) By letter to respondent dated May 19, 2000, Attorney Wiethorn forwarded to respondent a copy of a petition to show cause why respondent should not be compelled to file an account of decedent's estate and

stated that he would present it to the Honorable Lee Mazur, judge of the Court of Common Pleas of Allegheny County, on May 25, 2000.

(39) On or about May 25, 2000, Attorney Wiethorn presented to the court the petition to show cause.

(40) That same day, a decree was issued and a citation was awarded, which was returnable for June 23, 2000, directing respondent to show cause why respondent should not be compelled to immediately file an account of his administration of decedent's estate.

(41) On or about June 23, 2000, respondent filed an answer to petition for rule to show cause in which he indicated that distributions totaling $361,406.28 had previously been made to the beneficiaries, and the first and final account would be filed before August 1, 2000.

(42) On or about August 2, 2000, Attorney Wiethorn telephoned respondent and inquired on the status of the first and final account for the estate.

(43) Respondent responded to Mr. Wiethorn's inquiry by stating that respondent would have the first and final account to him by August 4, 2000.

(44) On or about August 14, 2000, Attorney Wiethorn received a copy of the first and final account respondent had prepared.

(45) The draft first and final account prepared by respondent reflected that there were $92,880.69 in funds available in the estate for distribution.

(46) On or about August 18, 2000, Attorney Wiethorn telephoned respondent and demanded that he immediately distribute the balance of the estate funds.

(47) Respondent stated that he would be taking the estate to audit, and would like to receive a proposal from Mr. and Mrs. Dean in order to settle the estate.

(48) On or about September 1, 2000, respondent filed the first and final account noting, among other things, that there were estate funds totaling $92,880.69 that were undistributed.

(49) By letter to respondent dated September 1, 2000, Attorney Wiethorn confirmed his conversation with respondent of that same date and stated that if he did not receive verification of respondent's handling of the estate funds by September 5, 2000, he would have to report respondent's conduct to the Disciplinary Board.

(50) Thereafter, respondent did not provide Attorney Wiethorn with verification of his handling of the estate funds.

(51) On or about September 21, 2000, Attorney Wiethorn filed on behalf of Mrs. Dean objections to first and final account of the estate of Joan K. Youngquist.

(52) On or about October 13, 2000, respondent provided Attorney Wiethorn with:

(a) A notice of audit which noted that the audit for the estate would be held on Monday, October 16, 2000;

(b) An ancillary account of the estate; and,

(c) PNC check numbers 1931 and 1932, drawn on his PNC account no. **********, captioned "Law Office of Daniel J. Evans," (law office account) made payable to Mia Dean and the Youngquist-Dean Family Education Trust in the amounts of $20,000 and $80,000 respectively.

(53) The source of the funds paid by respondent to Mrs. Dean and the Youngquist-Dean Family Trust was funds which he borrowed from members of his family.

(54) The ancillary account respondent had prepared and filed noted, among other things:

(a) An additional "Fund in lieu of investment income" from November 1997 through October 2000 in the amount of $13,374.72, thereby increasing the balance for distribution to $378,724.41; and,

(b) Additional distributions to Mia Dean and the trust totaling $100,000, thereby leaving an undistributed balance of estate assets in the amount of $6,255.41.

(55) Respondent then distributed the remaining $6,255.41 to the beneficiaries.

(56) The source of the remaining $6,255.41 distributed to the beneficiaries was a loan from a family member of respondent.

(57) On respondent's 1996-1997, 1998-1999, 1999-2000, and 2000-2001 Pennsylvania Attorney's Annual Fee Forms, he reported that there were *no* financial institutions in which he held funds of a client or third party.

(58) On his 1997-1998 Pennsylvania Attorney's Annual Fee Form, while respondent did not indicate that there were no financial institutions in which he held funds of a client or third party, respondent did not specify any financial institutions in which he held such funds.

(59) Respondent has practiced law for over 35 years and has no history of discipline.

## III. CONCLUSIONS OF LAW

By his conduct as set forth above, respondent violated the following Rules of Professional Conduct and Rules of Disciplinary Enforcement:

(1) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(2) R.P.C. 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

(3) R.P.C. 8.4(b)—It is professional misconduct for a lawyer to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.

(4) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

(5) Pa.R.D.E. 219(d)(1)(iii)—On or before July 1 of each year all persons required by this rule to pay an annual fee shall file with the administrative office a signed statement on the form prescribed by the administrative office in accordance with the following procedures: The statement shall set forth the name of each financial institution in the Commonwealth in which the attorney on May 1 of the current year or at any time in the previous 12 months held funds for a client or a third person subject to Rule 1.15 of the Pennsylvania Rules of Professional Conduct. The statement shall include the name and account number for each account in which the lawyer holds such funds, and each IOLTA account shall be identified as such.

## IV. DISCUSSION

This matter is before the Disciplinary Board on a petition for discipline charging respondent with misappropriation of entrusted funds in his capacity as executor for the estate of Joan Youngquist, failure to diligently represent the estate, and misrepresentations on his attorney annual fee forms. Respondent stipulated to most of the facts as alleged in the petition for discipline, including that fact that he used funds belonging to the estate for his own purposes. The amount of the misappropriated funds was approximately $90,000.

Respondent testified in his own defense and explained that he did not pay appropriate attention to the estate, as he was involved in other matters. He admits that he did not act expeditiously in closing the estate and this was due entirely to procrastination and lack of diligence on his part. As to the misappropriation, respondent believed that the estate owed him "substantial amounts of money" for work that he did in connection with renting the residential property that was part of the estate. Respondent drew funds from the estate account to pay himself but claims he did not realize that he was taking more than he was entitled to. Respondent kept no records of the time he spent doing these tasks for the estate, although he agrees that it did not add up to $90,000. He estimates that it was $20,000.

The beneficiary of the estate contacted respondent numerous times for an accounting. Respondent explained that when he finally put an accounting together, he realized that the amount of money in the estate was short and had been transferred from the estate account to his

office account and spent by respondent on office and personal bills. Ultimately the estate was settled to the satisfaction of the beneficiary.

As to the allegation that he made misrepresentations on his annual registration forms that he was not holding entrusted funds, respondent explained that he did not believe that funds held as an executor were subject to the reporting requirements. Clearly the funds belonging to the estate in the account at Mellon Bank were subject to the reporting requirement.

Mishandling of entrusted funds is one of the most troubling forms of attorney misconduct, and the discipline imposed has ranged from rare instances of non-public discipline to disbarment. Respondent has admitted misappropriating approximately $90,000. This is conduct that deserves disbarment. *Office of Disciplinary Counsel v. Lucarini,* 504 Pa. 271, 472 A.2d 186 (1983); *Office of Disciplinary Counsel v. Monsour,* 549 Pa. 482, 701 A.2d 556 (1997). Respondent offered no mitigating circumstances to justify a lesser sanction. Respondent's position that he was unaware that he took $90,000 and his misappropriation was merely a mistake is simply untenable. The sheer amount of money taken belies respondent's assertion that it was inadvertent.

For the reasons as set forth above, the board recommends that respondent be disbarred.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that the respondent, Daniel J. Evans, be disbarred from the practice of law in this Commonwealth.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the respondent.

Board Members Schultz and McLaughlin did not participate in the June 12, 2002 adjudication.

## ORDER

And now, February 28, 2003, upon consideration of the report and recommendations of the Disciplinary Board dated December 16, 2002, it is hereby ordered that Daniel J. Evans be and he is disbarred from the bar of this Commonwealth, and he shall comply with all the provisions of Rule 217, Pa.R.D.E.

It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.